**Robert HALPERN and Charlotte Kan Bonwit as Executors of the Estate of Robert Kan, Deceased, Plaintiffs,**

**v.**

**D. H. BARRAN et al.**

Court of Chancery of Delaware, New Castle.

Dec. 15, 1970.

William S. Potter, and Charles S. Crompton, Jr., of Potter, Anderson & Corroon, Wilmington, Ralph L. McAfee, John R. Hupper, and John Linsenmeyer, of Cravath, Swaine & Moore, New York City, for Asiatic Petroleum Corp., Shell Petroleum N. V. and Monroe E. Spaght.

Henry M. Canby, and Richard F. Balotti, of Richards, Layton & Finger, Wilmington, Harold F. McGuire, and William J. Rennert, of Wickes, Riddell, Bloomer, Jacobi & McGuire, New York City, for certain individual defendants.

Henry N. Herndon, Jr., of Morris, James, Hitchens & Williams, Wilmington, for Shell Oil Co.

Irving Morris, of Cohen, Morris & Rosenthal, Wilmington, Bruce A. Hecker, and Ralph L. Ellis, of Shea, Gallop, Climenko & Gould, and Joseph A. Ruskay, New York City, for plaintiffs.

DUFFY, Chancellor:

This is a derivative action on behalf of Shell Oil Company, a Delaware corporation ("Shell"), against certain corporations controlling approximately 69% of its outstanding stock and against its present directors and all other directors who held office between 1959 and 1969.[1] The complaint alleges wide-ranging transactions between Shell on the one side and the corporate defendants and various sub-

---

1. The "Royal Dutch/Shell group" consists of two foreign holding companies, Royal Dutch Petroleum Company, a Netherlands corporation, and "Shell" Transport and Trading Company, Ltd., an English corporation. These own, respectively, 60% and 40% of the other six corporate defendants, excluding Shell. Those six corporations, in turn, own 68.9% of the outstanding Shell stock.

sidiaries of the Royal Dutch/Shell group on the other; violation of fiduciary duties as to those transactions are charged to defendants. On the basis of plaintiffs' answers to interrogatories, defendants filed a Rule 11, Del.C.Ann. motion to strike the complaint as sham. This is the decision on that motion.

### A.

Rule 11 states:

" * * * The signature of an attorney constitutes a certificate by him that he has read the pleading; that to the best of his knowledge, information, and belief there is good ground to support it; and that it is not interposed for delay. If a pleading is not signed or is signed with intent to defeat the purpose of this rule, it may be stricken as sham and false * * *."

Plaintiffs contend that a Rule 11 motion is triggered only by "special circumstances": counsel knew that the allegations of the complaint were false or the allegations had their genesis in material unknown to him. Under this view a complaint will be dismissed "when it appears beyond peradventure that it is sham and false and that its allegations are devoid of factual basis." Murchison v. Kirby, 27 F.R.D. 14 (S.D.N.Y.1961); Brand v. Tisch, 253 F.Supp. 122 (S.D.N.Y.1966).[2]

■ As the Court observed in Freeman v. Kirby, supra, a motion to strike does not test the legal sufficiency of the claim stated, but whether the attorney who signed the pleading met the standards fixed by the Rule. For present purposes that means whether or not there was "good ground" to support the complaint against the corporate and individual defendants who are part of the Shell complex. While the Rule speaks in terms of an attorney's "knowledge, information, and belief", it

does not follow that good ground is measured by a subjective standard. (At least when the attack is upon the pleading and not upon the attorney.) On the contrary, the Rule permits a party to invoke and argue objective facts in testing for "good ground" support. Indeed, affidavits may be permissible for that purpose. 2A Moore's Federal Practice (2ed) § 11:02 (n. 9).

Thus while an attorney certifies or authenticates a pleading by his signature (and all that implies), the objective of the Rule is not limited to testing the conduct of counsel. The Rule has a purpose beyond that; in short, it serves a purpose in the lawsuit. It helps move litigation forward by eliminating from the case those pleadings which do not meet its standards: those are stricken and "the action may proceed as though the pleading had not been served."

In my view that purpose is accurately stated in *Moore,* supra:

"Rule 11 in conjunction with Rule 16, on Pre-Trial Procedure, Rule 56 on Summary Judgment, and Rule 36 on Admission of Facts and of Genuineness of Documents, serves a valuable function in winnowing the grain from the chaff. One vital objective of the Rules is that litigation concern itself with real issues."

In this respect such pretrial procedures define and delimit the real issues, without deciding those issues. Reynolds Metals Co. v. Metals Disintegrating Co., 176 F.2d 90 (3 Cir.1949); Wilson v. S. E. Massengill Co., 6 F.R.Serv. 11.41 (E.D.Tenn. 1942); and Moore, supra.

■ To achieve its purpose a motion under the Rule will be granted not only when counsel knew the allegations of the pleadings were false and when they had

2. See, also, American Automobile Association v. Rothman, 104 F.Supp. 655 (E.D. N.Y.1952); Nichols v. Alker, 126 F. Supp. 679 (E.D.N.Y.1954) aff'd 231 F.2d 68 (2 Cir. 1956); Freeman v. Kirby, 27 F.R.D. 395 (S.D.N.Y.1961); Palley v. Adams, Del.Ch., C.A. No. 1448, 10/4/61.

their genesis in material unknown to him; it will also be granted when there is a substantial overbreadth of pleading compared with the knowledge on which it is based. Every inference should, of course, favor the pleader. But when there is no reasonable relationship between the charges made and the information on which they are based, then the pleading lacks good ground to support it, it is sham and will be dismissed under the Rule.

### B.

The "charging" paragraphs of the pleading (complaint), which are based entirely on information and belief, read as follows:

"6. (a) At the time of the transactions complained of herein, [the corporate] defendants * * * by means of stock ownership and otherwise, directly and indirectly have dominated, controlled and directed the business and affairs of Shell and continue to do so.

(b) The [individual] defendants * * * were nominated, elected and continued in office as directors of Shell by reason of the control by the [corporate] defendants * * * and they were and are subservient to the directions given by [the corporate] defendants * * * and do not act independently.

"7. At all times since and prior to 1959 Shell, * * * [was] required by [the corporate] defendants * * * to purchase and [has] purchased substantial quantities of crude oil, natural gas liquids and other petroleum products amounting to 200,000 to 300,000 barrels on a daily average from other companies owned or controlled by [the corporate] defendants * * * at prices substantially exceeding those prevailing in the free market and at prices which were substantially higher than those at which Shell could have purchased the same in the free market. In many cases the price to Shell was equal to the approximate posted prices for such products whereas the current market prices at which such products could have been purchased from others was from 10% to 30% less than the posted prices.

"8. At all times since and prior to 1959 Shell [has] * * * engaged in transactions and a course of conduct between itself and other companies in the Royal Dutch/Shell Group which directly or indirectly involved the purchase, sale or exchange of crude oil, natural gas liquids, petroleum products, other goods, transportation and other services of or to Shell or third parties at the direction and instance of the defendants Royal Dutch and [the corporate defendants] * * * as a result of which Shell [was] required to pay in excess of the then fair value or the then current market value for said goods and services or to receive less than the then fair value or the then current market value from the sale or in the exchange of said goods and services.

"9. With respect to the transactions described in paragraphs 7 and 8 hereinbefore, Shell [was] * * * at the direction and instance of [the corporate] defendants * * * required to purchase at substantially more than the then fair value or the then current market value crude oil and petroleum products which were in excess of the needs of Shell for the purposes of enabling the sellers to dispose of large surpluses of such products.

"10. As a consequence of the transactions set forth hereinbefore, Shell incurred losses or was deprived of substantial profits and [the corporate] defendants * * * as well as the other companies in the Royal Dutch/Shell Group, other than Shell, benefitted, the precise amount of which is unknown to plaintiffs. Defendants have attempted to conceal the acts complained of herein and have commingled on the books of Shell revenues and costs related to the transactions complained of with unrelated revenues and costs by reason of which, and for other reasons, defendants are under a fiduciary obligation to render a full accounting of acts and transactions complained of herein.

"11. The individual defendants, as directors of Shell, and the corporate defendants, as controlling stockholders of Shell, have acted in bad faith and in violation of their respective fiduciary duties as officers, directors and controlling stockholders of Shell. The corporate defendants, through their control and domination of Shell, caused Shell to enter into the aforementioned transactions. The individual defendants participated, acquiesced in and consented to the wrongful acts and transactions herein complained or either with full knowledge thereof or with sufficient knowledge of facts and circumstances to put them on notice of said improper transactions and despite such knowledge they have taken no action either to seek restitution from the corporate defendants or to put an end to such improper transactions. As a result, the individual defendants have acted wrongfully carelessly, negligently, recklessly and imprudently in the conduct of the affairs of Shell and in violation of their fiduciary duties to Shell."

Counsel for plaintiffs refer to four categories of documents utilized in preparation of the complaint. These are: (1) annual reports of Royal Dutch, The "Shell" Transport and Trading Company, Limited, and Shell Oil; (2) proxy statements of Shell Oil; (3) transcript of a lecture given by H. Gripaios on August 31, 1964 in England (to the British Association for the Advancement of Science); (4) United States Department of Interior reports; and (5) articles in 1962 and 1963 by Edward Symonds, a petroleum economist of the First National City Bank (*Oil Advances in the Eastern Hemisphere* and *Eastern Hemisphere Petroleum—Another Year's Progress Analyzed*).

Plaintiff's reasoning, as I understand it, amounts to this: (1) The annual reports show that Shell and its subsidiaries had transactions including the purchase, sale and transportation of crude oil, petroleum and chemical products in the ordinary course of business with subsidiaries of Royal Dutch and The "Shell" Transport and Trading Company; (2) in his lecture Mr. Gripaios said that transactions between affiliated companies do not take place at the lowest prices prevailing in the market; (3) Mr. Symonds wrote that as to seven major international oil producing companies, of which Shell is one, the level of discounts to affiliates is lower than in arm's length transactions; (4) therefore, defendants breached their fiduciary duty to Shell.

Plaintiffs have put into the record many facts about the Royal Dutch/Shell corporate complex and exchanges of petroleum by it with third parties (independent companies). And the record does show transactions between Shell and subsidiaries of the Royal Dutch/Shell group. But the existence of transactions is, of course, not the problem. There is nothing unlawful nor tainted about a transaction (without more) between a parent and a dominated subsidiary. The question is whether or not in the transaction a fiduciary duty was violated. As to this, plaintiffs emphasize particularly the speech made in 1964 by Mr. Gripaios (whose connection with Shell, is not in any way identified in the record).[3] Mr. Gripaios said:

"* * * While most of what I am going to say has general application in the industry, I must remind you that I can only speak in general terms from a Shell point of view.

* * * * * *

"You may well now ask whether this means that transactions between affiliated companies take place at the lowest prices prevailing in the market at any point in

---

3. At argument on April 25, 1970, plaintiffs' counsel said:
"We have brought the suit because Mr. Gripaios has said that Shell was paying prices which are higher than was otherwise available. And it is just that simple."

time. The answer to this is 'No, and nor should they'.

\* \* \* \* \* \*

"However, there is an even more important reason why the prices between affiliated companies tend not to be at the lowest levels ruling in the market."

The two articles by Mr. Symonds, who has no identified connection of any kind with Shell, were written in 1962 and 1963. Plaintiffs point out that in his 1962 article he discussed posted prices, the discounts therefrom, and wrote:

"\* \* \* Moreover, it must be recalled that subsidiaries of the international companies, although normally charged at posted prices [i. e., with no discount] for crude or products received from affiliates, stand to benefit from freight concessions, financial accomodation [sic] and other assistance provided at the expense of the parent company."
and in his 1963 article:

"\* \* \* It arises partly from the practice of basing the profit-sharing formula on posted prices. As is well-known, for some years market conditions have obliged sellers of crude to discount these prices. \* \* \* In several parts of the Eastern Hemisphere, discounts are also now given on a producing company's sales to its own refining and marketing affiliates. But the level of such discounts is usually lower than in the case of arm's length transactions."

■ Do the Gripaios speech and the Symonds articles provide "good ground" for the charging paragraphs? In my view, they do not for several reasons.

First, the writings are in the most general terms, with only an oblique reference to Shell, at best. Second, the writings were published in 1964, 1963 and 1962, some five and more years *before* half the period cov-ered by this suit (1959–1969). Third, a fair reading of the Gripaios lecture indicates that he was speaking of crude oil only. And so was Mr. Symonds.

Plaintiffs have parlayed "transactions" (not unlawful in themselves) with these articles of general import into specific charges against defendants of "wrongfully, carelessly, negligently, recklessly" conducting the affairs of Shell "in violation of their fiduciary duties." Bad faith is charged in transactions involving, not crude alone, but also natural gas, petroleum products and "other goods, transportation and other services." And all of this not only before Mr. Gripaios spoke but for five years *after* he did. While his article shines with conviction, even he did not ascribe to it the prophecy which plaintiffs found therein.

The significance of the Gripaios and Symonds articles, as they apply to Shell, is in dispute. But I find no reasonable basis for dispute over the fact that the articles refer only to crude oil transactions and those in 1962, 1963, 1964. And for that reason alone the articles do not provide good ground for charges of self-dealing, mismanagement and the like during a ten-year period, half of it after the last of the articles was published, in transactions involving many subjects other than crude oil.

I am aware of the purpose which a derivative suit serves as a necessary vehicle for the redress of stockholder grievances. And it is, or can be, most difficult for the holder of shares to get adequate information about the subject of his grievances. But, even so, in our scheme of things, a suit must be based on more than mere suspicion. Good ground is required before defendants must be put to defense of an action with its concomitant obligation to give discovery (and that can be a substantial obligation). Here, it seems to me, there is no reasonable relationship between the sweeping nature of the charges made, as to both time and substance, and the knowledge and informa-

tion on which they were based. In short, a proper construction of the Rule requires the Court to find that there was not good ground to support the claims asserted in the complaint.[4] Freeman v. Kirby, supra.

The motion to strike will be granted.

4. I emphasize that at no point in the litigation has the good faith or motive of plaintiffs' counsel been challenged or put in issue. The question raised by the motion relates entirely to a construction of Rule 11 and, as the citations in the briefs show, decisions by eminent judges may well support the view argued by plaintiffs.